**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| **KANSAS CITY TAXI CAB** | ) | |
| **DRIVERS ASSOCIATION, LLC,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 12-00158-CV-W-GAF** |
| | ) | |
| **CITY OF KANSAS CITY,** | ) | |
| **MISSOURI,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Presently before the Court is Defendant City of Kansas City, Missouri's (the "City")
Motion for Summary Judgment. (Doc. # 45). Plaintiffs Kansas City Taxi Cab Drivers
Association, LLC (the "Association"); Gammachu Mixicha ("Mixicha"); and Taddessee Erbetto
("Erbetto") oppose.[1] (Doc. # 51). For the reasons set forth below, the City's Motion is
GRANTED.

## DISCUSSION

**I.   FACTS**

This case involves Kansas City Municipal Code § 76-73, which states:

(a)      The total number of permits for the operation of taxicabs shall be reduced
from a limit of 600 to 500 and no person may directly or indirectly control more
than 60 percent of the total outstanding permits. In order to reduce the number of
permits, any permit surrendered or forfeited shall not be reissued by the director
until the total number of permits does not exceed 500 permits. Each permit
holder must have at least 70 percent of the permitted vehicles in operational
condition as required by this code at all times.

(b)      All new applicants to operate taxicabs must permit at least ten vehicles.

---

[1] The Association, Mixicha, and Erbetto are collectively referred to as "Plaintiffs."

1

(c)     If the total number of permits issued at the time this chapter becomes effective exceeds the number authorized, those permits, if they meet all other requirements of this chapter and is thereafter terminated or canceled or expires, then an application for a new permit shall be required and the provisions herein limiting the number of permits shall apply.

(d)     The director may establish a waiting list of qualified applicants as an unbiased process to issue available permits.

Kan. City Mun. Code § 76-73.  Plaintiffs allege § 76-73 is unconstitutional under both the Due Process Clause and the Equal Protection Clause of the 14th Amendment to the United States Constitution.  (Complaint).

## A.     Section 76-73

The City regulates the taxicab industry, including taxicabs that pick up fares at Kansas City International Airport ("KCI"), under the auspices of the City's "Regulated Industries Division."  (Deposition of Gary Majors ("Majors Depo.") 15:10-25, 19:17-21).  To pick up fares in the City, including at KCI, taxicabs must have a valid permit.  (*Id.* at 21:4-15).  Taxicab permits follow the vehicle, not the driver.  (*Id.*).  Additionally, taxicab drivers must have a valid "driver's certificate," which is renewed annually.  (*Id.* at 22:22-23:1).

Taxicab permits are valid for a one-year period and are issued by the City on September 30 of each year.  (*Id.* at 23:2-7; Kan. City Mun. Code § 76-72).  Permits in good standing on September 30 of each year are eligible for renewal.  (Majors Depo. 24:7-12; Kan. City Mun. Code § 76-74).  A taxicab company seeking renewal of their permit must pay an annual $300 renewal fee for each permit.  (Majors Depo. 26:6-13, 17:15-18; Kan. City Mun. Code § 76-75).  Additionally, the City assesses a $22 inspection fee and an $8 fee for a replacement sticker to place on the taxicab.  (Majors Depo. 27:1-5).

Prior to July 10, 2005, under § 76-73, the City was permitted to issue up to 600 taxicab permits.  (*Id.* at 35:12-23).  On July 10, 2005, the City enacted a new § 76-73, which reduced the

2

number of available taxicab permits from 600 to 500. (Kan. City Mun. Code § 76-73(a)). Accompanying the new § 76-73 was an "Ordinance Fact Sheet." (Doc. # 44-4). The Ordinance Fact Sheet stated:

> Section 76-73, reduces the total number of permits for the operations of taxicabs from 600 to 500 by means of capitulation and volunteering. It has been show [sic] in past studies and today that there is not enough demand for 600 taxicabs operating on the streets of Kansas City. The last four (4) taxicab inspections conducted by the City of Kansas City, Missouri, show that an estimated number of no more than 450 taxicabs are available for service at anyone [sic] time. Additionally, the demand for additional permits has not been demonstrated. In fact demand has reduced due to a reduction in one of the prime contributors to the taxicab business – the number of convention business. Kansas City use[d] to average thirty (30) convention[s] annual[ly], currently that number has fallen to thirteen (13) annually.

(Ordinance Fact Sheet, 1).

Although the Ordinance Fact Sheet stated there was not enough demand for 600 taxicabs, the Manager of the Regulated Industries Division, Gary Majors, attested that no steps have been taken to reduce the number of permits available. (Majors Depo. 36:5-11). Additionally, Majors attested that subsection (c) of § 76-73 "in essence protects those companies that already had permits on the day the ordinance was passed." (*Id.* at 39:22-40:1). Majors also stated that "there would be great opposition [from] Checker Cab and most of the other smaller companies who are currently protected from additional [competition]" if a change to the new § 76-73 was introduced. (*Id.* at 110:19-11:14, 116:9-17; Doc. # 44-7).

**B.     Taxicab Industry**

Plaintiffs argue the regulatory scheme created by § 76-73, and its effect on the taxicab industry, are unconstitutional under the Due Process Clause and the Equal Protection Clause. (Doc. # 44). Accordingly, Plaintiffs introduced various pieces of evidence concerning the taxicab industry. (*Id.* at 5-18).

**1.     Taxicab permits**

3

Currently, there are 547 outstanding taxicab permits issued by the City, which are allocated between nine (9) taxicab companies. (Majors Depo. 51:2-7, 52:11-16). The permits generated revenue for the City as described in the table below:

| year | dollar amount |
|------|---------------|
| 2004 | $132,772.00 |
| 2005 | $154.50 |
| 2006 | $150.00 |
| 2007 | $144,216.00 |
| 2008 | $132,879.67 |
| 2009 | $128,066.00 |
| 2010 | $134,135.00 |
| 2011 | $152,819.01 |
| 2012 | $205,715.00 |

(Doc. # 44-8).[2]

Since 2004, the majority of the outstanding taxicab permits have been renewed on an annual basis. (Majors Depo. 53:10-16). However, seven (7) permits were involuntarily forfeited in 2005 by the company Atlas Cab for failure to properly insure their vehicle fleet. (*Id.* at 28:13-29:3, 49:24-51:1). Since 2004, no taxicab permit holder has attempted to transfer any taxicab permit, as allowed by ordinance. (*Id.* at 23:11-24:6, 53:17-19; *see* Kan. City Mun. Code § 76-72).

---

[2] The dollar amounts include money generated by livery permit renewals. (*See* Doc. # 44 ¶ 49).

Since 2004, no individual taxicab driver or driver-owned taxicab company has possessed a taxicab permit. (Defendant City of Kansas City, Missouri's Answer ("Dfdt. Ans.") ¶ 11). Under current law, a new applicant for a permit must apply for a minimum of ten (10) vehicle permits and maintain seventy percent (70%) of the permitted vehicles in operational condition. (*Id.*). Additionally, even if a new applicant has the ability to apply for ten (10) vehicles, the City will not consider the application until the number of outstanding permits drops to 490 or below. (*Id.* ¶ 20). However, current permit holders can apply for a new permit once the number drops to 499. (Majors Depo. 37:20-83:7). Currently, because there are 547 outstanding permits, there are no new permits available. (*Id.* at 55:11-15; Deposition of Russ Johnson ("Johnson Depo.") 47:11-16). The City's Regulated Industries Division has not created a waiting list of potential new permit applicants. (Majors Depo. 56:16-19).

The City considers applications for renewal of a taxicab permit by current permit holders before considering new permit applications. (Dfdt. Ans. ¶ 20). The nine (9) taxicab companies that currently possess the outstanding permits have a statutory right to automatically renew their permit annually. (Majors Depo. 39:9-21). The current permit holders can annually renew their permits, even if the number of outstanding permits is greater than 500, as long as they are in good standing with the City. (*Id.* at 61:22-62:3).

The City also introduced evidence concerning the taxicab industry. (Doc. # 46, p. 5). Melba Curls, a city council member since 2007, has received no complaints about the number of taxicabs in Kansas City. (Deposition of Melba Curls ("Curls Depo.") 60:15-61:12). Additionally, councilmember Russell Johnson testified that he did not recall any complaints about taxicabs except for complaints concerning vehicle conditions, credit card acceptance, and dispatching at KCI. (Johnson Depo. 59:10-25).

### 2. KCI

Mark VanLoh, Director of Aviation for the Kansas City Aviation Department, oversees all aspects of KCI, including taxi service at KCI. (Deposition of Mark VanLoh ("VanLoh Depo.") 4:23-5:9, 6:1-3). To operate a taxicab at KCI, a driver must hold a separate airport permit, in addition to the city-issued taxicab permit. (*Id.* at 7:20-8:2). To utilize the airport permit, the driver is required to deposit money on a "Trip Card," which operates like a debit card, to pay a $3 per-trip fee. (*Id.* at 9:11-10:3; Dfdt. Ans. ¶ 15). If a driver pays the $3 fee, the driver is permitted to enter the taxicab parking lot at KCI and await a fare. (VanLoh Depo. 9:11-10:3; Dfdt. Ans. ¶ 15).

According to Plaintiffs' Complaint, which is cited by the City, "a taxicab driver might wait upwards of seventeen (17) hours a day to get two fares at KCI, which will generate between $40.00 and $60.00 each." (Complaint ¶ 32). The City also introduced the deposition testimony of Erbetto and Mixicha. (Doc. # 46 ¶ 24). Erbetto testified that he, and most other "City Cab" drivers, pick up fares mainly from KCI. (Deposition of Taddessee Erbetto ("Erbetto Depo.") 18:8-19:1). According to Erbetto, City Cab drivers focus on KCI because "there's not much business in the city. The city business is held by Yellow Cab." (*Id.* at 18:18-23). Erbetto additionally testified he would generally have one (1) fare per day from KCI. (*Id.* at 19:14-16).

Mixicha testified that business at KCI was more robust during conventions. (Deposition of Gammachu Mixicha ("Mixicha Depo.") 35:19-25). Mixicha also testified he waited between six (6) and eight (8) hours to get a single fare from KCI. (*Id.* at 37:14-16).

### C. Taxicab Companies

Plaintiffs also introduced evidence concerning the major taxicab companies in Kansas City. (Doc. # 44). The taxicab companies that are current permit holders charge fees to their drivers for use of their taxicab permits. (*Id.* at 98:17-24).

## 1. Yellow Cab

Kansas City Taxi, LLC, which does business as Yellow Cab, ("Yellow Cab") currently holds 300 of the outstanding permits issued by the City. (Deposition of William George ("George Depo.") 14:21-25, 22:13-18). In 2011, Yellow Cab paid the City $95,060 for its annual permit renewal and vehicle inspections. (*Id.* at 41:3-13). Yellow Cab charges its drivers $260 per week for the use of their taxicab permits. (*Id.* at 26:18-22). In 2011, Yellow Cab's gross revenue related to its taxicab business was approximately $3,800,000. (*Id.* at 25:5-26:8). Yellow Cab drivers are not provided with health insurance and must pay for gas and maintenance for their vehicle. (*Id.* at 59:5-15, 61:2-9).

### i. William George's correspondence with VanLoh

William George ("George"), a consultant with Super Shuttle International who consults with Yellow Cab, is "friendly" with VanLoh. (*Id.* at 11:25-12:8). George and VanLoh exchanged emails with each other. (*Id.* at 12:11-13). In an email between George and VanLoh, George notified VanLoh about the above-captioned case. (Doc. # 44-13). VanLoh responded, "I love attorneys. The more the merrier." (*Id.*). On August 23, 2011, George sent an email to VanLoh that included a forwarded email from Rick Hughes ("Hughes"), the President of Kansas City's Convention and Visitors Board. (Doc. # 44-14). The Hughes forwarded email discussed a city council meeting in which an attorney made a presentation stating:

> The cab companies make tons of money (one makes 4 million he said like that was a bad thing) and the drivers pay onerous fees. He stated he had a way that the City could make more money, get better cab service and allow the drivers to make more money and enjoy benefits like health insurance. He has prepared a paper

7

with real numbers, he says, and presented that to the council. He did that by email so there were not copies available.

(*Id.*).

In reply, VanLoh stated:

This guy showed up at the T and I committee and spoke at the very end. You can view it on the website. He stopped out at the airport on his way out of town and dropped off a copy of the documents. They think that St. Louis is doing it right and we should walk into the light. We sent him back towards Regulated Industries.

(*Id.*). Additionally, VanLoh emailed to George that "[a]ll [he] heard" at the council committee meeting "was that you are making too much money. I guess we are becoming more socialist/communist each day." (*Id.*).

### 2. City Cab

Checker Services, Inc., which does business as City Cab, ("City Cab") currently holds ninety-nine (99) permits. (Deposition of Craig Bates ("Bates Depo.") 16:15-17:2, 41:24-42:1). In 2011, City Cab paid the City $31,878 for renewal of its permits and vehicle inspections. (*Id.* at 86:8-87:10). City Cab charges its drivers between $150 and $314 per week. (*See id.* at 75:1-14, 75:22-76:10). City Cab drivers do not receive health insurance.

### 3. Checker Cab

Checker Suburban, Inc., which does business as Checker Cab, ("Checker Cab") currently holds twenty-six (26) permits. (*Id.* at 16:15-23, 27:17-19). In 2011, Checker Cab paid the City $8372 for the renewal of its taxicab permits and vehicle inspections. (Doc. # 44-10). Checker Cab charges its drivers $390 per week for the use of its permitted taxicabs. (Bates Depo. 81:20-24). Drivers for Checker Cab receive no health insurance or other employee benefits from Checker Cab. (*Id.* at 103:13-24).

### D. Plaintiffs

The Association is a Missouri limited liability company whose members consist of taxicab drivers living and working in the Kansas City area. (Complaint ¶ 1). The drivers in the Association currently work for the nine (9) taxicab companies that exclusively possess all the taxicab permits distributed by the City. (Affidavit of Gammachu Mixicha ("Mixicha Aff.") ¶ 5).

Mixicha is President of the Association. (*Id.* ¶ 3). Mixicha works five (5) to six (6) days per week as a taxicab driver for City Cab. (Mixicha Aff. ¶¶ 6, 7). Mixicha's weekly "take-home pay" is $200 to $250 per week. (*Id.* ¶ 11).

Erbetto, the third Plaintiff, is the treasurer of the Association. (Affidavit of Taddessee Erbetto ("Erbetto Aff.") ¶ 3). Erbetto is also a driver for City Cab. (*Id.* ¶ 6). Erbetto drives his cab five (5) days per week, for which he receives $200 in take-home pay. (*Id.* ¶¶ 7, 11). Mixicha and Erbetto attested that a taxicab driver must pay "substantial" weekly fees to the taxicab companies, cover operating expenses of the vehicle, and lease the vehicle from the company. (*Id.* ¶ 12; Mixicha Aff. ¶ 12). Mixicha and Erbetto also attested that they each have the financial means to start driver-owned taxicab companies but, because no permits are available and Plaintiffs are "not given a fair and equal opportunity to obtain" permits, they are prevented from starting such a business. (Mixicha Aff. ¶ 12; Erbetto Aff. ¶ 12).

## II.    LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate if the evidence, viewed in the light most favorable to the [nonmovant] and giving [the nonmovant] the benefit of all reasonable inferences, shows there are no genuine issues of material fact and [the movant] is entitled to judgment as a matter of law." *Price v. N. States Power Co.*, 664 F.3d 1186, 1991 (8th Cir. 2011)

(citation omitted). "Once the moving party has made and supported their motion, the nonmoving party must proffer admissible evidence demonstrating a genuine dispute as to a material fact." *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011) (citation omitted). Summary judgment should not be granted if a reasonable jury could find for the nonmoving party. *Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990); *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.   ANALYSIS

Plaintiffs argue the "effect of the regulatory scheme in § 76-73 is to wholly deny potential new applicants, like Plaintiffs, equal access to and participation in the annual Taxicab Permit application process, including equal consideration in the decision to issue Taxicab Permits." (Doc. # 44, p. 5). Further, according to Plaintiffs, the "inequalities" created by § 76-73 violate both the Equal Protection and Due Process Clauses of the Constitution. (*Id.*).

The parties agree that no fundamental right or suspect classification is at issue in this case. (Doc. # 51, p. 1). Accordingly, the parties agree the Court should analyze Defendant's Motion using "rational basis review." (*Id.*). The analyses of the Equal Protection Clause and the Due Process Clause using rational basis review are similar. Under the Equal Protection Clause, the City must establish that § 76-73 "is rationally related to some legitimate governmental interest." *Ranschburg v. Toan*, 709 F.2d 1207, 1209 (8th Cir. 1983) (citations omitted). Under rational basis review, an ordinance is presumed valid. *City of Cleburne, Tex. v. Cleburne Living Cen.*, 473 U.S. 432, 440 (1985) (citations omitted). However, such review, while deferential, is not "toothless." *Mathews v. Lucas*, 427 U.S. 495, 510 (1976) (citations omitted). As stated by the Supreme Court:

> [E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted

and the object to be attained.  The search for the link between the classification and objective gives substance to the Equal Protection Clause; it provides guidance and discipline for the legislature, which is entitled to know what sorts of laws it can pass; and it marks the limits of our own authority.

*Romer v. Evans*, 517 U.S. 620, 632 (1996).  If a legislature has '"plausible reasons,"' a court's '"inquiry is at an end."'  *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993) (quoting *U.S. R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980)).

"A rational basis that survives equal protection scrutiny also satisfies substantive due process analysis."  *Exec. Air Taxi Corp. v. City of Bismarck, N.D.*, 518 F.3d 562, 569 (8th Cir. 2008) (additional citation omitted) (citing *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 470 n.12 (1981)).  Specifically, an "ordinance is unconstitutional [under the Due Process Clause] if it is arbitrary, capricious and not rationally related to a legitimate public purpose."  *WMX Techs., Inc. v. Gasconade Cnty., Mo.*, 105 F.3d 1195, 1198 (8th Cir. 1997) (citing *Pennell v. City of San Jose*, 485 U.S. 1, 11 (1988)).

Accordingly, the Court cannot overturn § 76-73 if there exists 1) a legitimate purpose for the ordinance and 2) a rational relationship between any purposes and the ordinance.  As to the first issue, there are several legitimate purposes behind § 76-73.  Some mentioned by the parties are: 1) reducing the number of taxicabs in Kansas City because of a lack of demand, 2) creating incentives for taxicab companies to invest in the infrastructure of the taxicab industry, and 3) increasing quality in the taxicab industry.[3]  Additionally, governments have an interest in '"protecting the interests of those who rely upon prior law."'  *Peoples Rights Org., Inc. v. City of*

---

[3] Plaintiffs discuss only the purpose stated in the Ordinance Fact Sheet: reducing the number of taxicabs.  However, a court need  not look to only the purpose presented at the time the ordinance was passed.  *See Romer*, 517 U.S. at 635 (analyzing the purposes cited by the government in its briefs); *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 21 F.3d 237, 240 (8th Cir. 1994) (stating that a court can look to all rationales for the government action, including those offered by litigants or other courts (quoting *Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 463 (1988))).

11

*Columbus*, 152 F.3d 522, 531 (6th Cir. 1998) (quoting *Sklar v. Byrne*, 727 F.2d 633, 641-42 (7th Cir. 1984)). The above-mentioned purposes are legitimate. *See Greater Houston Small Taxicab Co. Owners Ass'n v. City of Houston, Tex.*, 660 F.3d 235, 240 (5th Cir. 2011) ("[P]romoting full-service taxi operations is a legitimate government purpose under the rational basis test."). Indeed, Plaintiffs admit that the goal of reducing taxicabs was legitimate. (Doc. # 44, p. 13).

Accordingly, the next question is whether the legitimate purposes are rationally related to § 76-73. Section 76-73(a) reduces the amount of permissible taxicab permits from 600 to 500 and is, therefore, rationally related to the goal of reducing the number of taxicabs on the streets. It is irrelevant that § 76-73 allows reduction through voluntary attrition as opposed to compulsory and systematic seizure. *See City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("Legislatures may implement their program step by step . . . in such economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.") (citations omitted). Additionally, as explained by the City, the automatic renewal provision in the ordinance created "the incentive to maintain [taxicab] infrastructure or seek to improve it, since that kind of capital investment could be for naught if the company does not get any permits the following year." (Doc. # 54, p. 11). The City "plainly could further that objective by making the reasoned judgment that" allowing automatic renewal if a taxicab company engages in satisfactory conduct would increase the likelihood that a company would engage in the desirable conduct of investing in infrastructure. *See Dukes*, 427 U.S. at 304. As to the third rationale behind § 76-73 – increasing quality – the City introduced evidence that there have been no complaints to the city council concerning the number of taxis available in Kansas City. (Curls Depo 60:15-61:12; Johnson Depo. 59:10-25).

Plaintiffs argue § 76-73 is unconstitutional because no taxicab company has voluntarily reduced its number of permits since the ordinance was enacted in 2005. (Doc. # 68, p. 5). However, whether the City's goal of reducing taxicabs has not occurred under the ordinance is immaterial to determining the ordinance's constitutionality. *Barket, Levy & Fine*, 21 F.3d at 240 (determining that regulatory scheme was not unconstitutional even though a post-enactment study suggested the scheme was not feasible).

Plaintiffs also argue § 76-73 is unconstitutional because it includes an impermissible "grandfather clause." (Doc. # 51, pp. 10-12). Plaintiffs' argument is unpersuasive. The Supreme Court, in *Dukes*, held that grandfather clauses were constitutionally permissible because "a legislature need not 'strike at all evils at the same time.'" *Dukes*, 427 U.S. at 305 (quoting *Semler v. Dental Exam'rs*, 294 U.S. 608, 610 (1935)). In this case, it was permissible for the City to allow the number of taxis to be reduced gradually by allowing voluntary reduction in permits. *See id.* at 305 (finding that a "gradual approach to [a] problem is not constitutionally impermissible"). In support of their claims, Plaintiffs make several other arguments concerning the permitting system. These arguments are insufficient because, as described above, § 76-73 is rationally related to legitimate government purposes. *See Barket, Levy & Fine*, 21 F.3d at 240 (stating that a plaintiff must negate every conceivable basis that might support an ordinance (quoting *Beach Commc'ns*, 508 U.S. at 315)).

"[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations . . . ." *Dukes*, 427 U.S. at 303 (citation omitted). Accordingly, although the Court appreciates Plaintiffs' complaints concerning the economic realities of the taxicab industry, "it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the [Constitution.]" *Id.* at 303-04 (citation omitted); *see also Craigmiles*

*v. Giles*, 312 F.3d 220, 223-24 (6th Cir. 2002) ("Even foolish and misdirected provisions are generally valid if subject only to rational basis review."). As described above, the City had legitimate rationales to enact § 76-73 and § 76-73 is rationally related to those rationales. Thus, it is constitutional under the Due Process Clause and the Equal Protection Clause.

## CONCLUSION

Analyses under the Equal Protection Clause and the Due Process Clause are similar. Under both, an ordinance is constitutional if it is rationally related to some legitimate government purpose. In this case, there were legitimate government purposes behind enacting § 76-73. Additionally, § 76-63 is rationally related to those purposes. Accordingly, for these reasons and the reasons set forth above, the City's Motion is GRANTED.

**IT IS SO ORDERED.**

s/ Gary A. Fenner
GARY A. FENNER, JUDGE
UNITED STATES DISTRICT COURT

DATED: January 30, 2013

Case 4:12-cv-00158-GAF   Document 70   Filed 01/30/13   Page 14 of 14